Filed 7/30/13  P. v. Jenkins CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B239019 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA079874) |
| v. | |
| RICHARD BENJAMIN JENKINS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sandra Thompson, Judge.  Affirmed.

Lise M. Breakey, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Richard Benjamin Jenkins of resisting an executive officer with force, a felony, and three misdemeanor counts of assault on a peace officer, disturbing the peace and vandalism. He was sentenced under the three strikes law to an aggregate state prison term of 26 years to life. On appeal Jenkins contends the trial court committed prejudicial error when it failed to respond to a jury question by instructing that use of excessive force at any point during the arrest, even after his act of resistance, rendered the arrest unlawful; denied his request to discharge retained counsel and represent himself; failed to dismiss his prior strike convictions; and miscalculated his presentence conduct credits. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Charges*

Jenkins was charged by information with assault with a deadly weapon or by means likely to produce great bodily injury upon a peace officer (Pen. Code, § 245, subd. (c)) (count 1),[1] resisting an executive officer (§ 69) (count 2) and vandalism with damage valued at more than $400 (§ 594, subd. (a)) (count 3). The information specially alleged Jenkins had suffered four prior serious felony convictions in 1992 for forcible rape (§ 261, subd. (a)(2)) within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and section 667, subdivision (a), and had served a prior prison term for a felony (§ 667.5, subd. (b)). Jenkins pleaded not guilty and denied the special allegations.

2. *Summary of the Evidence Presented at Trial*

    a. *The People's evidence*

Beginning at 11:00 a.m. on December 21, 2010 Jenkins began occupying a motel room after the registered guest had checked out. In a telephone call the desk clerk told Jenkins he would have to pay for the room and provide identification if he wanted to stay; Jenkins hung up the telephone. The desk clerk then went to the room and knocked on the door; nobody answered. The clerk tried to open the door using a master key; Jenkins

---

[1]    Statutory references are to the Penal Code unless otherwise indicated.

pushed against the door, preventing it from opening. Jenkins then apparently placed a piece of furniture in front of the door to keep it from being opened. Los Angeles County Sheriff's deputies arrived at approximately 12:30 p.m. in response to a call from the clerk. Deputies tried to persuade Jenkins to open the door, but were unsuccessful. The deputies left several hours later.

The owner of the motel, Nevandra Patel, had arrived at the scene around noon. After the deputies left, Patel called the room but failed to convince Jenkins to depart. After discussing the matter that evening with friends from the Sheriff's Department, a captain called the South Los Angeles station to have deputies return to the motel. Patel authorized deputies to damage motel property, if need be, to remove Jenkins.

Sheriff's deputies returned at approximately 9:30 p.m. Deputy Michael Maxwell testified Jenkins did not respond to orders made by loudspeaker to leave the room. Maxwell knocked on the door; Jenkins opened the curtain a few inches, yelling something. Maxwell repeatedly told Jenkins to come out. After Maxwell tried to open the door with the key, he saw Jenkins throw the television on the ground and move the dresser and a mattress to block the door. Jenkins then picked up a three-foot plastic stick, which he wielded like a baseball bat. Because the circumstances were escalating, Sergeant Charles McDaniel, who was in charge of the operation with Maxwell, ordered Deputy Christian Ortiz to fire ceramic rounds at the window to break it. Maxwell continued to order Jenkins to come out of the room. Although Maxwell could not understand much of what Jenkins was yelling, he did hear "If you want me to come out, then come get me." Maxwell described Jenkins as extremely agitated, pacing back and forth, having a blank stare and looking as though he were in an altered state.

Sergeant McDaniel broke the window with a three-to-four-feet-long crow bar after multiple ceramic rounds failed to shatter the window. As McDaniel was using the hooked end of the crow bar to pull the curtain rod down so deputies could see into the room, Jenkins rushed toward the window with his stick raised. McDaniel lifted his right hand to defend himself; a piece of glass struck the back of his finger, requiring

3

13 stitches.[2] According to Deputy Maxwell, Jenkins's stick had dislodged a piece of glass that was attached to the window frame.

McDaniel ordered Deputy Ortiz to fire the beanbag shotgun. Ortiz fired four rounds through the window, hitting Jenkins in the arm or shoulder. The blows had little-to-no effect on him. Meanwhile, deputies used a battering ram to knock down the door. When the deputies entered the room, Jenkins, agitated and still wielding the stick, was standing near the back. He approached the deputies, and Ortiz fired three more beanbag rounds. Jenkins fell to his knees and dropped the stick.

Sergeant McDaniel testified he ordered Deputy Roberto Reyes to use his taser on Jenkins because Jenkins was charging toward the deputies. Reyes testified Jenkins was lying facedown on the floor but reaching for the stick when he fired the taser from about five feet away. The taser dart lodged in Jenkins's arm. Jenkins kept thrashing around, reaching for the stick and hitting his head on the floor. Reyes believed he may have cycled the taser more than once. A log of electrical discharges recorded by the taser gun indicated Jenkins received 25 seconds of electrical discharge. Jenkins was then handcuffed by deputies.

b. *The defense evidence*

Jenkins, who did not testify on his own behalf, presented the expert testimony of former Los Angeles Police Officer Timothy Williams in support of the defense theory the deputies had used excessive force in executing a private favor for the captain's friend. Williams opined Jenkins, who was barricaded in the motel room, presented no risk of harm to people, thus there was no justification for the use of any force, including the initial attempt to shatter the window, even though Jenkins may have been damaging furniture in the room. Instead, the deputies should have called in a mental health assessment team or a special weapons team trained to handle a barricade situation. Williams also opined there were multiple instances in which the deputies used excessive

---

[2]     McDaniel testified the laceration became infected and at one point there was a risk of amputation. Although McDaniel lost full range of movement in the finger, he eventually returned to his full job duties.

force. For example, firing ceramic pellets through the window when Deputy Ortiz could not see Jenkins constituted excessive force because the pellets could have struck and injured him; the beanbags were fired at too close range (less than 30 feet away) creating the possibility of injury to vital organs and at a time when officers could have physically maneuvered Jenkins to the ground and handcuffed him; the use of the taser was improper because Jenkins was already on the ground; and the 25-second duration of the taser was particularly egregious because even muscular individuals can be incapacitated with a five-second burst.

Jenkins also presented the testimony of a doctor who described Jenkins's injuries and opined Sergeant McDaniel's injury was minor.

3. *The Jury Instructions; the Jury's Questions; the Verdict*

The jury was fully instructed on the charged offenses and several lesser-included offenses, including instructions that addressed a peace officer's use of excessive force. With respect to resisting an executive officer (§ 69) the jury was instructed with CALCRIM No. 2652, "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant unlawfully used force or violence to resist an executive officer; [¶] 2. When the defendant acted, the officer was performing his lawful duty. [¶] AND [¶] 3. When the defendant acted, he knew the executive officer was performing his duty. [¶] . . . [¶] The duties of a Los Angeles County Sheriff's deputy include investigation, detention, and arrest. [¶] A peace officer is not lawfully performing his duties if he is using unreasonable or excessive force in his duties. Instruction 2670 explains when force is unreasonable or excessive."

CALCRIM No. 2670, in turn, described the requirement of lawful performance by a peace officer, "The People have the burden of proving beyond a reasonable doubt that Sergeant McDaniel, Deputies Maxwell, Ortiz, Reyes, and Smith were lawfully performing their duties as peace officers. If the People have not met this burden, you must find the defendant not guilty of counts 1 and 2 and the applicable lesser included charges. [¶] A peace officer is not lawfully performing his duties if he is unlawfully

5

arresting someone or using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest. . . ."

In addition, the jury was instructed with CALCRIM No. 2672 regarding a defendant's use of force to resist an unlawful arrest: "The defendant is not guilty of the crime of assault against a peace officer, or[] assault with force likely to produce great bodily injury, against a peace officer or resisting arrest, if the officer was not lawfully performing his duties because he was unlawfully arresting someone. [¶] However, even if the arrest was unlawful, as long as the officer used only reasonable force to accomplish the arrest, the defendant may be guilty of the lesser crime of assault or assault with force likely to produce great bodily injury. [¶] On the other hand, if the officer used unreasonable or excessive force, and the defendant used only reasonable force, then the defendant is not guilty of the lesser crimes of battery or assault, or assault with force likely to produce great bodily injury/a deadly weapon. [¶] The People have the burden of proving beyond a reasonable doubt that the officer was lawfully performing his duties. If the People have not met this burden, you must find the defendant not guilty of counts 1 and 2 and any applicable lesser included offenses." "A peace officer may use reasonable force to arrest or to prevent escape, or to overcome resistance. [¶] If a person knows or reasonably should know that a peace officer is arresting him, the person must not use force or any weapon to resist an officer's use of reasonable force. However you may not find th[e] defendant guilty of resisting arrest if the arrest was unlawful, even if the defendant knew or reasonably should have known that the officer was arresting him."

During deliberations the jury sent out a question suggesting at least one of its members may have been confused about the role of excessive force. It asked, "Does police use of excessive force at any point during the confrontation make police conduct unlawful, or does excessive force make police conduct unlawful only at and after the point of excessive force?" With counsel's agreement the court instructed the jury to refer to CALCRIM Nos. 2670 and 2672, copies of which were in the jury room.

6

This response did not suffice. An hour later the jury sent a request stating, "We cannot reach verdicts on Count 1 [assault on a peace officer] or Count 3 [vandalism[3]] without the further instructions we have asked for: [¶] 1. Does police use of excessive force AFTER the defendant committed a crime erase or justify that crime. . . ." Since it was the end of the day (a Monday), the court directed counsel to draft a proposed instruction to be considered on the following Wednesday, August 31, 2011, when the jury was to resume its deliberations.

On August 31, 2011 Judge Sandra Thompson, who had presided at the trial, was unexpectedly in the hospital. Filling in, Judge Eric Taylor reviewed the jury's pending questions with counsel. While considering how to proceed, the jury returned a verdict finding Jenkins guilty of resisting an executive officer with force, a felony, and misdemeanor assault on a peace officer and disturbing the peace (lesser included offenses to assault on a peace officer with a deadly weapon), as well as misdemeanor vandalism.

Sentencing was originally scheduled for September 14, 2011 and then continued by Judge David Sotelo until October 27, 2011.

4. *Jenkins's Motion To Strike the Prior Conviction Allegations*

On October 24, 2011 Jenkins moved to dismiss the prior strike conviction allegations. His privately retained counsel argued the limited record from 1992, which did not include a sentencing transcript, failed to demonstrate Jenkins, then 17 years old, had been properly advised of his constitutional right to a jury trial, to confront witnesses and to be free of compelled self-incrimination before pleading no contest to the rape charges (see *Boykin v. Alabama* (1969) 395 U.S. 238, 243 & fn. 5 [89 S.Ct. 1709, 23 L.Ed.2d 274] (*Boykin*); *In re Tahl* (1969) 1 Cal.3d 122, 132 (*Tahl*)), and his plea had not been voluntarily and intelligently obtained (see *People v. Sumstine* (1984) 36 Cal.3d 909, 918-919). Jenkins argued the preprinted docket that had an "x" placed before the boxes indicating he had been fully advised of his rights, without more, was insufficient. (See *In re Birch* (1973) 10 Cal.3d 314, 321-322.)

---

[3] The jury had previously asked a question about vandalism.

7

In his declaration in support of the motion, Jenkins's counsel, David Durchfort, explained the discovery he had received from the People on the prior convictions only included fingerprints, prison notes and an abstract of judgment. He had been told a sentencing transcript was available, but he had not received it notwithstanding his requests. Durchfort had the criminal case file pulled and examined. Although the file included the docket sheet, it did not contain a sentencing transcript, waiver form or other proof of plea. When Durchfort contacted the court reporter's office at the courthouse, he was told the court reporter had retired and notes could not be produced.

On October 25, 2011 the People filed a sentencing memorandum requesting Jenkins be sentenced to 26 years to life in state prison. The People argued Jenkins had numerous prior convictions as an adult and sustained juvenile petitions, including the four rape convictions for which he had been sentenced to 29 years. Jenkins was on parole at the time he committed the current offenses. The People argued Jenkins's motion to strike should be rejected because it was essentially a time-barred motion to withdraw his plea pursuant to section 1018.

Although the People's sentencing memorandum did not address the evidence concerning Jenkins's advisements and the voluntariness of his plea, attached as an exhibit was a copy of the transcript from the March 27, 1992 plea hearing. The copy includes a header stating "<<DIGITIZED COPY MA002933 Vol: JENKINS Seq: 1044630 page [numbers 5-21] Printed by: 519574 on : 9/01/2011 12:04 PM>>." The final page is a certificate by the court reporter that "the foregoing is a true and correct transcript of all of the admonitions given and waivers and admissions taken at the time of the taking of the plea . . . ." The transcript reflects the trial court advised Jenkins of his *Boykin-Tahl* rights and he waived them.

Trial on the prior conviction allegations, scheduled for October 27, 2011, was again continued until November 28, 2011.

5. *Denial of Jenkins's Motions To Proceed In Propria Persona and To Strike the Prior Conviction Allegations*

At the commencement of trial on the prior conviction allegations, the court (Judge Thompson) heard Jenkins's motion to discharge Durchfort, which the court and Jenkins both erroneously labeled as a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) [addressing the right to replace court-appointed counsel, not privately-retained counsel]). Jenkins described numerous reasons he had lost confidence in Durchfort's ability and willingness to effectively represent him. He recounted disputes the two had during trial about the presentation of, and failure to challenge, certain evidence and accused Durchfort of knowingly allowing the People to present altered photographs of Jenkins with his most serious injuries removed. Jenkins also explained Durchfort had only reluctantly filed the motion to strike the prior conviction allegations and was unwilling to challenge the authenticity of the 1992 transcript that had been belatedly produced, which Jenkins argued was fraudulent. Jenkins accused Durchfort of lying to him about several issues, screaming at him and using profanity, only visiting him four times for a total of 80 minutes and overcharging him $61,000 for his services. Jenkins concluded his recitation by asking the court to allow him to represent himself under *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*) "with the assistance of counsel."

Explaining "the bottom line is you had the best advantage of lawyering that I've seen in the 30 years I've been here in terms of the manner in which Mr. Durchfort represented you," the court told Jenkins, "I'm not prepared to grant your *Marsden* motion and postpone your sentencing." The court further explained, "You've indicated what you think my alternatives are [regarding sentencing you], but I don't think you have a realistic view of what options are available to me. I think you would be acting to your detriment not to have the advisement of Mr. Durchfort for the balance of your trial." Jenkins persisted, describing the reasons he believed he could establish the 1992 transcript was fraudulent and asking, "[C]an I please represent myself pro per? Give me the opportunity to bring myself up to speed on this case, what discovery is necessary, the motions that are

9

in. Give me a chance to review this. I cannot have access to allow the prior unless I'm pro per. Give me 60 days. That's all I'm asking." The court denied the request.

The court proceeded to try the prior conviction allegations. After testimony from two witnesses, defense counsel objected to the admission of various documents, including an abstract of judgment signed in 2000, on the ground they had been fraudulently obtained. The court adjourned the proceedings for the day so it could examine the documents.

On November 30, 2011, when trial on the prior conviction allegations resumed, Jenkins immediately requested "another *Marsden* hearing." In support of his argument Durchfort had wrongly urged him to admit the 1992 prior convictions and was failing to properly challenge them, Jenkins insisted "it's now been proven that the prosecution does not have in its possession a valid copy of my abstract of judgment, and . . . the court itself does not even have my sentencing transcript. Therefore, we have ground to have my 1992 priors excluded should the court decide to acknowledge this fact and then take the moral and legally correct next step . . . ." Jenkins also complained Durchfort had given the People permission to take Jenkins's fingerprints against his will. Jenkins asked to represent himself and "for a 30 day extension in time, and [that] the court order the People and defense to turn over their discovery in this case to me enabling me to bring myself up to speed." In denying Jenkins's motion the court explained, "Apparently, you are not going to agree on some of the issues that were presented in this court. The presentation you made this afternoon and on the 28th of November have convinced me that you are not capable of representing yourself, that you don't understand some of the issues. Some of the presentations that you have made are as to circumstances that don't have anything to do with this case. And I don't believe my postponing your matter for 30 days or 60 days as you asked for on the 28th would give you enough time to get up to speed, quote unquote, on this case."

After denying Jenkins's request to represent himself, the court found the prior convictions to be true and denied his motion to strike the prior convictions in the interest of justice. (§ 1385; *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.) The

court also denied Jenkins's section 17, subdivision (b), motion to reduce the prior strike felonies to misdemeanors. Jenkins then renewed his October 24, 2011 motion to strike the prior convictions on the ground there was no authenticated transcript demonstrating Jenkins's plea was taken in accordance with *Boykin*, *supra*, 395 U.S. 238 and *Tahl*, *supra*, 1 Cal.3d 122. The court denied the motion, and proceedings were suspended to give Jenkins an opportunity to file a motion for new trial.

6. *Denial of Jenkins's Motion for New Trial*

On December 8, 2011 Jenkins moved for new trial on count 2, resisting an executive officer, under section 1181 (grounds for new trial include "[w]hen the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial"). Jenkins argued the jury's questions suggested it may have believed excessive force had been used, but did not understand without further instruction that excessive force negated one of the elements of resisting arrest. The court denied Jenkins's motion for new trial on December 15, 2011, stating, "And I guess by the time [Judge Taylor] was getting ready to respond, then the jury buzzed and said there was a verdict. It is not without precedent that jurors often send out questions indicating that they are unable to reach a verdict, unless and until we give them the definition of whatever it is that they're disagreeing on. And many times while we are formulating the response to their questions, many times they buzz and say, 'Never mind, we've already decided what the verdict should be.' I think it's purely speculative on any of our parts to say that the reason they reached a verdict is because of one thing or another. We don't know."

7. *Sentencing*

On January 27, 2012, after Jenkins's petition for a writ of mandate was denied, the court sentenced him to an aggregate state prison term of 26 years to life under the Three Strikes Law for resisting an executive officer with force, consisting of 25 years to life plus one additional year pursuant to section 667.5, subdivision (b). The court struck Jenkins's conviction for disturbing the peace, and sentence on the other counts was imposed and stayed pursuant to section 654. The court also awarded Jenkins 402 days of

actual presentence custody credit but failed to calculate his conduct credit. On October 1, 2012 the abstract of judgment was amended to award Jenkins 200 days of conduct credit for a total of 602 days of custody credit.

## DISCUSSION

1. *Any Error In Failing To Timely Respond to the Jury's Question Was Harmless*

Positing that any use of excessive force from the time the deputies arrived at the motel until he was handcuffed would vitiate the crime of resisting an executive officer,[4] Jenkins argues the jury was improperly instructed because the phrase "when the defendant acted" in CALCRIM No. 2652 implied only excessive force at the exact moment Jenkins actively resisted—that is, when he injured Sergeant McDaniel's finger by striking the glass—would preclude his conviction for the crime. Jenkins further argues, while CALCRIM Nos. 2670 and 2672, unlike CALCRIM No. 2652, do not include an express temporal linkage, the three instructions considered together created an ambiguity as demonstrated by the jury's questions.

### a. *Standard of review*

We review claims of improper jury instructions de novo to determine whether the trial court fully and fairly instructed on the applicable law. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) To make this determination, we interpret instructions to support the judgment where reasonably possible and assume the jurors are intelligent individuals capable of understanding and correlating all the instructions given. (*Martin*, at pp. 1111-1112.) When an instruction is ambiguous, the reviewing court examines the record to determine whether there is a reasonable likelihood the jury misconstrued or misapplied the operative language. (*People v. Clair* (1992) 2 Cal.4th 629, 663.)

Trial courts are required to instruct jurors during deliberations "if they desire to be informed on any point of law arising in the case." (§ 1138; *People v. Cleveland* (2004)

---

[4]     Although lawful police conduct is also an element of assault on a peace officer, Jenkins does not challenge his misdemeanor conviction for this offense.

12

32 Cal.4th 704, 755 [§ 1138 "imposes on the court the 'primary duty to help the jury understand the legal principles it is asked to apply'"]; see *People v. Ross* (2007) 155 Cal.App.4th 1033, 1047.) A trial court may satisfy this duty by simply rereading instructions already given if those instructions are full and complete and adequately answer the jury's question on the facts of the case. (See *People v. Smithey* (1999) 20 Cal.4th 936, 984-985; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212.) Rereading instructions that are inadequate, rather than responding directly to the jury's question, however, is error. (*People v. Gonzales* (1999) 74 Cal.App.4th 382, 390-391, disapproved on another ground in *People v. Anderson* (2011) 51 Cal.4th 989, 998, fn. 3.) Nonetheless, any failure to clarify the applicable law following a question from the jury is state law error only, "tested under the relatively lenient standard of *People v. Watson* (1956) 46 Cal.2d 818, 836"—that is, whether it is reasonably probable the defendant would have obtained a more favorable outcome if the error had not occurred. (*Ross*, at pp. 1054-1056; see *People v. Mower* (2002) 28 Cal.4th 457, 484 ["if a trial court's instructional error violates only California law, the [harmless error] standard is that stated in *People v. Watson*"].)

    b. *Jenkins has not forfeited or waived his challenge to the jury instructions*

  The People contend Jenkins has forfeited, if not affirmatively waived, his challenge to the jury instructions because his counsel requested several of the instructions Jenkins now complains are confusing (see *People v. Harris* (2008) 43 Cal.4th 1269, 1293 ["""'doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction"'""]); failed to request a pinpoint instruction that would relate specific facts of the case to the legal issues (see *People v. Rogers* (2006) 39 Cal.4th 826, 878 [trial court has no sua sponte duty to give pinpoint instructions]); and failed to object to the court's suggestion to respond to the jury's first question simply by referring them to CALCRIM Nos. 2670 and 2672.

  Absent the pending second question from the jury on the timing issue, we would agree Jenkins forfeited his argument the instructions were impermissibly confusing.

However, Jenkins's counsel was actively engaged in the process of determining how the jury should be instructed in response to the second question, and had asked that proceedings be halted until the judge who had presided at the trial returned, when the verdict was returned. On these somewhat unusual facts, Jenkins cannot be said to have waived or forfeited his objection to the adequacy of the instructions.

c. *The law governing resisting an executive officer and the use of excessive force*

The offense of resisting an executive officer can be committed in two ways: "The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 814.)[5] However, "[t]he long-standing rule in California and other jurisdictions is that a defendant cannot be convicted of an offense against a peace officer '"*engaged in . . . the performance of . . .* [his or her] *duties*"' unless the officer was acting lawfully at the time the offense against the officer was committed. [Citations.] 'The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in "duties," for purposes of an offense defined in such terms, if the officer's conduct is unlawful. . . . [¶] . . . [T]he lawfulness of the victim's conduct forms part of the corpus delicti of the offense.'" (*Id.* at p. 815.)

In *People v. White* (1980) 101 Cal.App.3d 161, 164 (*White*) the court addressed the requirement of lawful conduct in a case involving charges of assault and battery upon a peace officer (§§ 242, 243, 245, subd. (b)) and misdemeanor resisting arrest (§ 148), a lesser included offense of resisting an executive officer in the performance of his or her duty with force of violence. (See *People v. Lacefield* (2007) 157 Cal.App.4th 249, 259.)

---

[5] Section 69 provides, "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."

14

In *White* the defendant began grabbing and pushing a police officer while he was arresting the defendant's friend for shoplifting. Other police officers arrested the defendant, who physically resisted until she was handcuffed and placed in the back of the police car with her friend. The officers subsequently decided to separate the two women. After they opened the police car door, the defendant jumped out and began screaming. When an officer tried to subdue her using a carotid restraint, she struggled and bit the officer; and they both fell to the ground. (*White*, at p. 165.) According to the defendant, she only bit the officer because he was choking her and she was unable to breathe. (*Id.* at pp. 167-168.)

The *White* court held the trial court had failed to properly instruct the jury "that where excessive force is used in making what otherwise is a technically lawful arrest, the arrest becomes unlawful and a defendant may not be convicted of an offense which requires the officer to be engaged in the performance of his duties [citations]." (*White*, *supra*, 101 Cal.App.3d at p. 164.) Noting "[t]he word 'unlawful' in defining arrest is typically applied where a defendant claims his arrest was lacking in probable cause," the court explained "an arrest made with excessive force is equally unlawful. . . . 'That portion of section 243 of the Penal Code which raises battery, a misdemeanor, to felony status where the victim is a peace officer engaged in the performance of his duties, does not come into play where the officer makes an illegal arrest, simply because "[an] officer is under no duty to make an unlawful arrest." [Citation.] *It goes without saying, of course, that neither is it the duty of officers to taunt or beat persons arrested*.' [Citation.] Thus, in the present case it became essential for the jury to be told that if they found the arrest was made with excessive force, the arrest was unlawful and they should find the defendant not guilty of those charges which required the officer to be lawfully engaged in the performance of his duties [citations]." (*Id.* at p. 167; accord, *People v. Olguin* (1981) 119 Cal.App.3d 39, 45 (*Olguin*) [instructions erroneous when jury led to believe defendant's use of reasonable force to resist excessive force applied only to battery charges; defendant testified officers, including an old high school rival, beat him when he would not get out of police car following his arrest because he feared for his life].)

15

d. *The jury was properly instructed on the law, and any failure to respond to the pending question before the verdict was rendered was harmless*

Although not directly disputed by the Attorney General, the fundamental premise of Jenkins's argument is flawed:  Excessive force applied by the deputies after Jenkins's forcible act of resistance (use of the taser), but before the arrest was complete, does not vitiate the offense of resisting arrest.  To be sure, certain broad language in *White* and *Olguin* arguably supports Jenkins's position, but, as Jenkins acknowledges, those cases did not address the precise issue confounding the jury in the instant case—whether excessive force applied after the act of resistance is a defense to the crime of violent resistance.  The Supreme Court in *Yount v. City of Sacramento* (2008) 43 Cal.4th 885 (*Yount*), however, provided guidance on the question.  In that case Steven Yount suffered injuries when a police officer, Thomas Shrum, shot him in the buttocks while trying to transport him to jail following his arrest for driving under the influence.  (*Id.* at p. 888.) Yount—struggling, swearing and yelling at officers—had been placed in the patrol car. After he shattered the window by kicking it, officers attempted to transfer Yount to another car.  During the ensuing struggle Yount kicked an officer in the groin and spat on him.  Officers succeeded in restraining Yount's legs and ankles, but he still tried to bite, kick and spit at them.  Officer Shrum, intending to subdue Yount with his taser, mistakenly drew his pistol and shot him.  (*Id.* at pp. 890-891.)

Yount, who was charged with driving under the influence, violent resistance (§ 69) and battery on a peace officer (§ 243, subd. (c)(2)), pleaded no contest to driving under the influence and a single count of misdemeanor resisting arrest (§ 148).  He also stipulated to a factual basis for the plea without a recitation of what those facts were. (*Yount*, *supra*, 43 Cal.4th at p. 895.)  Yount subsequently sued Officer Shrum and the City of Sacramento for violating his civil rights, alleging, when he was shot, he was "arrested, handcuffed, and hobbled at the time and was not then attempting to interfere with the officers; that Yount at no time posed any reasonable threat of violence to Officer Shrum or did anything to justify the force used against him; and that the force used against him was excessive, unnecessary, and unlawful." (*Id.* at p. 892.)  The *Yount* Court

16

was confronted with the question whether Yount's claim under title 42 United States Code section 1983 (section 1983) should be dismissed as an improper collateral attack on his criminal conviction pursuant to *Heck v. Humphrey* (1994) 512 U.S. 477 [114 S.Ct. 2364, 129 L.Ed.2d 383], "which first established that a section 1983 claim calling into question the lawfulness of a plaintiff's conviction or confinement is not cognizable until the conviction or confinement has been invalidated." (*Yount*, at p. 893; see *Heck*, at p. 486, fn. 6.)

The Supreme court held "Yount's claims are barred to the extent they allege that Officer Shrum was not entitled to use force *at all* in this incident. Yount's resistance justified the officers' use of reasonable force in response. [Citation.] However, as defendants concede, the use of *deadly* force was not reasonable in this instance. Yount's conviction for violating . . . section 148, subdivision (a)(1)[,] did not in itself justify the use of deadly force, either. Accordingly, Yount's civil claims are not barred to the extent they challenge Officer Shrum's use of deadly force." (*Yount*, *supra*, 43 Cal.4th at p. 889.) Significantly, in rejecting Shrum and the City's argument "the *Heck* bar should nonetheless apply [to preclude Yount's claims in their entirety] because the shooting was part of a continuous transaction arising from Yount's resistance as well as 'a consequence flowing directly from Yount's criminal conduct,'" the Court provided an example that demonstrates the fallacy of Jenkins's position here that excessive force used at any time while the deputies were executing their duties vitiates the crime of forcible resistance: "The use of deadly force in this situation, though, requires a separate analysis. 'For example, a defendant might resist a lawful arrest, to which the arresting officers might respond with excessive force to subdue him. The subsequent use of excessive force would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of the criminal defendant's attempt to resist it. Though occurring in one continuous chain of events, two isolated factual contexts would exist, the first giving rise to criminal liability on the part of the criminal defendant, and the second giving rise to civil liability on the part of the arresting officer.'" (*Yount*, at p. 899.)

17

The jury's questions in this case about the consequence for Jenkins's criminal liability of any use of excessive force by the officers after Jenkins's own act of resistance reflected a careful examination of the instructions: CALCRIM No. 2652 correctly includes a temporal link between the act of resistance and the lawful exercise of the officers' duties (CALCRIM No. 2652 ["[w]hen the defendant acted, the officer was performing his lawful duty"]) while CALCRIM No. 2670, describing lawful performance, is more broadly written, arguably suggesting excessive force at any time during the arrest is unlawful (CALCRIM No. 2670 ["[a] peace officer is not lawfully performing his duties if he is unlawfully arresting someone or using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest"]). But, any failure to timely respond to the jury's question about this issue because of the unanticipated hospitalization of the trial court judge could not have been prejudicial. If the jury believed excessive force had been applied, it clearly thought it only occurred after the act of resistance. Thus, it was not reasonably probable Jenkins would have obtained a more favorable outcome had the jury's question been timely answered.

2. *The Trial Court Did Not Abuse Its Discretion in Denying Jenkins's Motions To Discharge Retained Counsel and for Self-representation*

a. *Governing law*

The mutually exclusive rights of a criminal defendant to counsel and to self-representation are both protected by the Sixth Amendment. (See *Faretta*, *supra*, 422 U.S. at p. 819 ["[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1069 ["'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. [Citations.] At the same time, . . . because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself.'"].) The manner in which each right may be exercised varies significantly depending on the stage of the proceedings.

18

### i. *A nonindigent defendant's right to retain and discharge private counsel*

A nonindigent criminal defendant has the right to choose his or her own counsel. (*People v. Courts* (1985) 37 Cal.3d 784, 789.) The right to counsel of choice also permits a defendant to discharge retained counsel with or without cause. (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*) ["right to discharge retained counsel is based on '"necessity in view both of the delicate and confidential nature of the relation between [attorney and client], and of the evil engendered by friction or distrust"'"].) "A nonindigent defendant's right to discharge his retained counsel, however, is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*Ibid*.)

Unlike the showing required by an indigent defendant seeking to substitute appointed counsel discussed below, a nonindigent defendant need not demonstrate his or her retained counsel "is providing inadequate representation [citations], or that he [or she] and the attorney are embroiled in irreconcilable conflict . . . ." (*Ortiz*, *supra*, 53 Cal.3d at p. 984.) The nonindigent defendant's right—and the showing required—to discharge retained counsel does not change when the defendant who starts out nonindigent becomes indigent and seeks to discharge retained counsel and obtain appointed counsel. (*Ibid.*)

### ii. *An indigent defendant's right to obtain, and limited right to replace, appointed counsel*

An indigent defendant has the right to the appointment of counsel at all critical stages of a prosecution. (*Gideon v. Wainwright* (1963) 372 U.S. 335, 344 [83 S.Ct. 792, 9 L.Ed.2d 799] ["in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him"]; *People v. Marsden, supra,* 2 Cal.3d at p. 123; U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) "'"'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances

19

of the attorney's inadequate performance.  [Citation.]  A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].'"'" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)  After the defendant has been afforded the opportunity to explain the grounds for his motion to substitute counsel, the trial court has discretion to deny the motion unless the defendant has made a sufficient showing of a substantial impairment of his right to counsel.  (*People v. Burton* (1989) 48 Cal.3d 843, 855.)

### iii. *The right to self-representation*

A defendant has the right under the Sixth and Fourteenth Amendments to waive the right to counsel and to represent himself or herself if he or she is competent to do so, and knowingly, voluntarily and intelligently invokes that constitutional right a reasonable time prior to the start of trial (*People v. Lynch* (2010) 50 Cal.4th 693, 721-722, overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 637) or sentencing proceedings (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1024 [because sentencing hearing is separate proceeding from trial, timely, unequivocal, knowing and intelligent request for self-representation should be granted as matter of right ]).  Otherwise, a defendant's request for self-representation is addressed to the sound discretion of the trial court.  (*People v. Windham* (1977) 19 Cal.3d 121, 127-129 (*Windham*).)

When a request for self-representation has not been timely made, the trial court must inquire sua sponte into the reasons for the request and exercise its discretion in light of several factors identified in *Windham*.  Those factors include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham*, *supra*, 19 Cal.3d at p. 128; accord, *People v. Lynch*, *supra*, 50 Cal.4th at p. 722, fn. 10.)

20

The Supreme Court in *Windham* "decline[d] to mandate a rule that a trial court must, in all cases, state the reasons underlying a decision to deny a motion for self-representation which is based on nonconstitutional grounds." (*Windham*, *supra*, 19 Cal.3d at p. 129, fn. 6.)  The court's exercise of discretion in denying the untimely motion is properly affirmed if substantial evidence in the record otherwise supports the inference the court had those factors in mind when it ruled. (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1206.)  This is true even if the trial court failed not only to state the reasons for its decision to deny the motion but also to make the sua sponte inquiry generally required.  Thus, in *People v. Dent* (2003) 30 Cal.4th 213, a motion for self-representation was denied without a *Windham* inquiry solely because it was a death penalty case, an improper reason.  The Supreme Court stated, "Even though the trial court denied the request for an improper reason, if the record as a whole establishes defendant's request was nonetheless properly denied on other grounds, we would uphold the trial court's ruling." (*Dent*, at p. 218.)  Ultimately the Supreme Court concluded the record in *Dent* did not otherwise support denial of the motion.  Nevertheless, *Dent* sanctions appellate review of the entire record to determine whether the trial court abused its discretion in denying a motion for self-representation, even when the trial court based its denial of self-representation on an improper ground and without a *Windham* inquiry.

> b.  *The record demonstrates the trial court did not abuse its discretion in denying Jenkins's untimely request to discharge retained counsel and represent himself*

Jenkins contends the trial court made compounding errors in denying his motions to discharge retained counsel and represent himself.  Acknowledging his requests to discharge retained counsel and represent himself  may not have been timely, he argues the court still erred because it improperly analyzed his requests under *Marsden*, which requires a showing of incompetence or irreconcilable conflict, instead of *Ortiz* and *Faretta/Windham*, which do not.  Jenkins further argues application of an improper standard was an abuse of discretion that led to the court's failure to make the required findings, which the record demonstrates could not in any event be properly made.  (See

21

*People v. Lara* (2001) 86 Cal.App.4th 139, 165 [rejecting argument trial court's ruling was correct in law even if based on erroneous application of *Marsden* factors instead of *Ortiz* factors; "'[w]here fundamental rights are affected by the exercise of discretion by the trial court, . . . such discretion can only be truly exercised if there is no misconception by the trial court as to the legal basis for its action'"].)

Jenkins is correct *Marsden* was not the proper rubric under which to analyze either his request to discharged retained counsel or to represent himself. Nevertheless, employing the *Dent* Court's practical approach permitting review of the entire record to determine whether the trial court abused its discretion in denying an untimely motion for self-representation, we are persuaded the trial court's ruling was proper. (See *People v. Dent*, *supra*, 30 Cal.4th at p. 218.)

The threshold issue is timeliness. The trial court would have been required to grant a timely motion for self-representation because there was no question about Jenkins's competence and the record demonstrates his request was knowing, voluntary and intelligent. But, Jenkins's motions were not timely. Unlike the motion for self-representation in *People v. Miller*, *supra*, 153 Cal.App.4th at pages 1018, 1023 to 1024, which was made after the defendant had admitted prior prison term allegations and his motion for new trial had been denied, but well in advance of sentencing, Jenkins first moved to represent himself at the beginning of the bifurcated trial on his prior convictions with two witnesses waiting to testify. Indeed, as the *Miller* court explained in reaching its conclusion, sentencing "is not like a bifurcated trial on prior convictions." (*Id*. at p. 1024.) "[A]ppellate courts have concluded that a motion for self-representation made after the jury returns its verdict on a primary offense but prior to commencement of a bifurcated trial on prior convictions is untimely and subject to the trial court's discretion because proceedings on the priors are merely part of the trial." (*Id*. at p. 1023.) Moreover, Jenkins initially sought a 60-day continuance to get "up to speed." Although he later reduced the request to 30 days, substantial evidence supports the trial court's conclusion Jenkins would unlikely be able to proceed in even 60 days given the complexity of the issues he sought to challenge. (Cf. *Ortiz*, *supra*, 51 Cal.3d at pp. 983-

22

984 ["the 'fair opportunity' to secure counsel of choice provided by the Sixth Amendment 'is necessarily [limited by] the countervailing state interest against which the sixth amendment right provides explicit protection:  the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time"'"].)

Jenkins contends, when he made his motions, he was concerned, not with his trial on the prior convictions, but with his sentencing hearing, which took place two months later, and with a motion to strike his prior convictions upon *Boykin-Tahl* grounds, which could have been filed at any time prior to sentencing.  He argues, had the trial court applied the right standard and denied his motions under *Ortiz* and *Faretta* as untimely, he could have renewed them after the bifurcated trial was completed, but still well in advance of sentencing, and exercised his unconditional right to represent himself at sentencing.  (See *People v. Miller*, *supra*, 153 Cal.App.4th at p. 1015.)  But he could have renewed the motion in any event.  Had he done so, and had the trial court again applied an improper standard in denying it, we might well have ordered a new sentencing hearing.  In the absence of a timely motion, and in light of the disruption that permitting self-representation would have caused, Jenkins is not entitled to any relief.

3. *The Trial Court Did Not Err in Denying Jenkins's Motion To Dismiss His Prior Convictions*

A defendant may collaterally attack a prior felony conviction alleged as the basis for a sentence enhancement on the ground it was based on a plea taken without proper advisements that the defendant has the right to a jury trial, to confront witnesses and to be free of compelled self-incrimination (commonly called *Boykin-Tahl* rights).  (*People v. Sumstine*, *supra*, 36 Cal.3d at p. 919.)  "When a defendant makes sufficient allegations that his conviction, by plea, in the prior felony proceedings was obtained in violation of his constitutional *Boykin-Tahl* rights, the trial court must hold an evidentiary hearing.  At the hearing, the prosecution bears the initial burden of producing evidence that the defendant did indeed suffer the conviction.  The defendant must then produce evidence to

23

demonstrate his *Boykin-Tahl* rights were infringed. The prosecution then has the right to rebuttal, at which point reliance on a silent record will not be sufficient." (*People v. Allen* (1999) 21 Cal.4th 424, 435.)

Jenkins does not dispute the contents of the reporter's transcript from the 1992 plea hearing established he was informed and waived his *Boykin-Tahl* rights.[6] Rather, he contends the transcript is inadmissible because, despite the court reporter certification of accuracy, the copy that was admitted itself is not a certified copy; it was printed from an unknown source and stored in digital format, which made it susceptible to manipulation; and no one testified to its authenticity. "'Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law.'" (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187 (*Skiles*); Evid. Code, § 1400.) Although "'a certified copy of an official writing 'is prima facie evidence of the existence and content of such writing or entry' under [Evidence Code] section 1530,[7] . . . a noncertified copy, by itself, is not reliable enough to constitute such prima facie evidence. However, nothing in section 1530 forbids authentication by another

---

6      Jenkins's challenge to whether he had been informed of his rights and waived them is tepid. In his declaration Jenkins states, "I have no memory of being informed how I could fight the charges, what my rights were, whether it was in my best interest to plead, how to challenge the evidence, or the consequences of my plea. I was scared, confused, alone and told to make a deal. I was told to plead to avoid a worse fate. I did what I was told."

7      Evidence Code section 1530 provides, "(a) A purported copy of a writing in the custody of a public entity, or of an entry in such a writing, is prima facie evidence of the existence and content of such writing or entry if:  [¶]  (1)  The copy purports to be published by the authority of the nation or state, or public entity therein in which the writing is kept; [¶]  (2)  The office in which the writing is kept is within the United States . . . and the copy is attested or certified as a correct copy of the writing or entry by a public employee, or a deputy of a public employee, having the legal custody of the writing; or [¶] . . . [¶]  (b)  The presumptions established by this section are presumptions affecting the burden of producing evidence."

method." (*Skiles*, at pp. 1186-1187; see Evid. Code, § 1521, subd. (a) [content of a writing may be proved by otherwise admissible secondary evidence].)

In *Skiles* the prosecutor had presented certified copies of court records from Alabama to prove the defendant had suffered an out-of-state serious felony conviction for purposes of the three strikes law. During trial on the prior convictions it was determined the copies were incomplete. Over the lunch recess the prosecutor had a single page from the defendant's indictment faxed from the Alabama's clerk office. The trial court admitted the document over the defendant's foundation objection. (*Skiles*, *supra*, 51 Cal.4th at pp. 1181-1182.) Comparing the faxed copy to certified copies of other official court documents that described the offenses, the name of the court and the county and that were from the same date and certified by the same court clerk, the *Skiles* Court held "there was sufficient evidence to sustain a finding that the faxed document was an accurate copy of an authentic court record" from Alabama. (*Id.* at pp. 1182, 1188.)

Here the reporter's transcript includes the same identifying information as other properly authenticated documents admitted into evidence: the defendant's name, the case number, the court and date of the plea hearing. Additionally, unlike *In re Birch*, *supra*, 10 Cal.3d 314, cited by Jenkins for the proposition handwritten checkmarks on a preprinted docket form indicating advisement and waiver of *Boykin-Tahl* rights are insufficient to establish waiver, the docket in this case is consistent with the transcript and reflects waiver of all Jenkins's *Boykin-Tahl* rights. (See *In re Birch*, at p. 320 [addressing purported advisement and waiver of right to counsel].) Even if not sufficient in and of itself to establish compliance with *Boykin-Tahl*, the docket sheet, in conjunction with the other indisputably authentic documents, were sufficient circumstantial evidence establishing the authenticity of the 1992 reporter's transcript.

4. *Good Conduct Credit Issue*

Section 4019 governs conduct credits. Before January 25, 2010, subdivisions (b) and (c) of section 4019 provided that for "each six-day period in which a prisoner is confined in or committed to" a local facility, one day is deducted from the period of confinement for performing assigned labor and one day is deducted from the period of

confinement for satisfactorily complying with the rules and regulations of the facility. (Stats. 1982, ch. 1234, § 7, p. 4553.)  Former subdivision (f) of section 4019 provided, "[I]f all days are earned under this section, a term of six days will be deemed to have been served for every four days spent in actual custody."  (Stats. 1982, ch. 1234, § 7, p. 4554.)

Effective January 25, 2010, section 4019 was amended to provide that certain defendants could earn presentence credits at the rate of two days for every two days in custody, commonly referred to as one-for-one credits.  (Stats. 2009, 3rd Ex.Sess. 2009-2010, ch. 28, § 50.)  Exempted from this amendment were registered sex offenders and defendants committed for a serious felony or who had prior serious or violent felony convictions.  These defendants were subject to the pre-January 25, 2010 formula for calculating presentence credits.  (§ 4019, former subds. (b)(2) & (c)(2).)

This amendment remained in effect until September 28, 2010, when urgency legislation was adopted restoring the calculation of custody credits to the pre-January 25, 2010 formula for crimes committed after the effective date of the revision.  (Stats. 2010, ch. 426, § 2.)  Subsequently, in connection with other legislation relating to the Criminal Justice Realignment Act, effective October 1, 2011, section 4019 was once again amended to increase conduct credits and four days are deemed served for every two days in actual custody.  (§ 4019, subds. (b), (c), (f); Stats. 2011, ch. 15, § 482.)  Subdivision (h) provides, "The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail . . . for a crime committed on or after October 1, 2011.  Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law." (§ 4019, subd. (h).)

Jenkins crimes were committed on December 21, 2010.  He was sentenced on January 27, 2012 without receiving any conduct credits.  On October 1, 2012 his sentence was modified and the abstract of judgment corrected to reflect 200 days of conduct credit under a two-for-every-four formula for the entire period of his presentence incarceration.

26

Jenkins contends he is entitled to the current one-for-one credit—an additional 60 days of conduct credit—for the time he spent in presentence custody after the October 1, 2011 effective date of the current version of section 4019. He argues section 4019, subdivision (h), cannot be interpreted to only permit the new formula to be used for inmates who have committed crimes after October 1, 2011—even though that is what it says—because such a construction would render the second sentence in subdivision (h) surplusage.

In *People v. Ellis* (2012) 207 Cal.App.4th 1546, the court concluded, "In our view, the Legislature's clear intent was to have the enhanced rate apply *only* to those defendants who committed their crimes on or after October 1, 2011. [Citation.] The second sentence does not extend the enhanced rate to any other group, but merely specifies the rate at which all others are to earn conduct credits. So read, the sentence is not meaningless, especially in light of the fact the October 1, 2011, amendment to section 4019, although part of the so-called realignment legislation, applies based on the date a defendant's crime is committed, whereas section 1170, subdivision (h), which sets out the basic sentencing scheme under realignment, applies based on the date a defendant is sentenced." (*Ellis*, at p. 1553; see *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 51-52 ["[h]owever inartful the language of subdivision (h), we read the second sentence as reaffirming that defendants who committed their crimes before October 1, 2011, still have the opportunity to earn conduct credits, just under prior law"].) We see no reason to depart from these courts' sound analysis of section 4019, subdivision (h).

## DISPOSITON

The judgment is affirmed.

PERLUSS, P. J.

We concur:

WOODS, J.                    ZELON, J.

27